## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHARLES WIRTZ, JR. and | ) | |
| CHRISTY CALLAHAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-08-1062-F |
| | ) | |
| STATE FARM MUTUAL | ) | |
| AUTOMOBILE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the court are the cross motions of the parties for summary judgment pursuant to Rule 56, Fed. R. Civ. P.   Upon due consideration of the parties' submissions, the court makes its determination.

Standard of Review

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  When applying this standard, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. (quotation omitted).  When the parties file cross motions for summary

judgment, as in this case, the court is entitled to "assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Id.* (quotation omitted); *see also*, <u>Buell Cabinet Co., Inc. v. Sudduth</u>, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.")

<u>Relevant Facts</u>

On August 27, 2005, a vehicle driven by plaintiff, Charles Wirtz, Jr. ("Wirtz"), collided with a bicycle driven by Paul Thompson.  Wirtz fled the scene of the accident.  Thompson sustained serious bodily injuries.  Wirtz was later arrested for leaving the scene.

Wirtz  was insured under a policy of insurance issued by defendant, State Farm Mutual Automobile Insurance Company ("State Farm"), to plaintiff, Christy Callahan ("Callahan").  The policy carried a per person liability limit of $25,000.00.

On September 12, 2005, State Farm received notice of a third-party claim.  The claim was assigned to claim representative Debra Pulliam ("Pulliam").   On September 15, 2005, Pulliam spoke to Thompson's wife and learned that Thompson was still in the hospital and had incurred significant medical bills.  That same day, Pulliam wrote to Thompson and asked him to sign a medical authorization and give State Farm a list of his medical providers.

On September 16, 2005, Pulliam spoke with Howard K. Berry, III ("Berry"), the attorney for Thompson.  According to Pulliam's notes of the conversation, Pulliam "[r]ec'd a call from clmt [Thompson] atty Howard Berry; will send letter of rep; went over the injuries of [Thompson]; aware of the policy limits; expld will need to confirm permissive use; Berry will send out letter of rep, advise of the UIM carrier, request a

sub waiver, get a copy of the ER bill, as the ER bill will exceed the available policy limits per atty; this may be one that we can settle soon." Ex. C to defendant's motion.

On the same day, Pulliam called Callahan to ask about her relationship to Wirtz. Callahan advised that Wirtz was her husband and that they had been married since January of 2005. Pulliam requested Callahan to have Wirtz call her for a statement. Wirtz called and gave Pulliam a statement regarding the accident. During the conversation, Pulliam advised Wirtz that Thompson's injuries "will exceed available policy limits and we will try to settle for policy limits and obtain a Release." Ex. C to defendant's motion.

Pulliam wrote a letter dated September 16, 2005 to Wirtz and Callahan informing them that it was possible that "injuries claimed against you may be in excess of the protection afforded by this policy," and that State Farm would do everything possible to protect them within the policy limits, but that they may be held personally responsible for any judgment above the limits. Pulliam also informed Wirtz and Callahan that in view of their personal liability, it would be agreeable with the company for Wirtz and Callahan to employ attorneys of their own choosing to personally represent them in this matter. Ex. E to defendant's motion.

On September 23, 2005, Pulliam received a letter from Berry, dated September 21, 2005. In the letter, Berry stated three things he wanted accomplished in the "next week or so." He wanted (1) to take a statement from Wirtz to determine whether he was on the job for anyone at the time of the accident and confirm that he had no other vehicles that were insured; (2) to see a declaration sheet on the insurance policy; and (3) for State Farm to offer the $25,000.00 policy limits. Berry then advised:

> If these things can be accomplished then I will discuss this matter with Mr. Thompson as to whether or not he should release Mr. Wirtz from civil liability in exchange for the

$25,000.00 or whatever amount of insurance there is. This is, of course, assuming that he was not on a mission on anyone else's behalf.

We are undertaking to ascertain what amount of uninsured motorist coverage is available here so we are not in a position just yet to state that we could accept the $25,000.00 but I hope to be in that position very soon provided that State Farm and Mr. Wirtz are willing to cooperate in this matter.

If I do not here [sic] from you by October 1st I will assume that one or more of these requests I have made is not something that State Farm and Mr. Wirtz are willing to comply with and I will take action to take judgment against Mr. Wirtz.

Ex. F to defendant's motion.

On September 26, 2005, Callahan informed Pulliam that Wirtz's criminal attorney had advised him not to give any statements. The next day, September 27, 2005, Pulliam informed Berry that Wirtz's criminal attorney had advised him not to give any statements. She also advised Berry that she was forwarding a copy of the certificate of coverage to him.

On September 28, 2005, Callahan informed Pulliam that Wirtz's criminal attorney had given Wirtz permission to give a statement to Berry. Pulliam contacted Berry and advised him that Wirtz would be giving a statement. According to Berry, Pulliam indicated to him "that even if Mr. Wirtz gives a statement that is satisfactory to me that [Pulliam] would not be willing to pay the $25,000.00 in exchange for a full release of all claims because State Farm would require something in writing from the uninsured motorist carrier that would amount to some kind of waiver of subrogation." Berry stated: "I just do not understand your position. I would think you would want to get a full and final release from my client in exchange for the $25,000.00 in policy

4

limits." Berry advised in a letter dated September 29th confirming the conversation that "[i]f State Farm continues to refuse to pay the $25,000.00 in exchange for a full release, I will be forced to file a lawsuit regardless of how exonerating Mr. Wirtz's statement to me is." Ex. 8 to plaintiffs' motion.

Wirtz gave a statement to Berry regarding the accident. In the statement, he advised that he was not working at the time of the accident and that he did not have another vehicle or insurance of any kind.

On September 30, 2005, Berry contacted Pulliam concerning settlement. According to Pulliam, Berry "would like to settle the BI claim today on clmt Thompson; has a hospital bill for $40K that he will fax; asked the atty if he rec'd a subrogation waiver letter from Farmers[] the UIM carrier or are they willing to substitute pay; The atty says that he has not and again not sure why I needed that [;] expld the UIM sub rights; atty disagrees; said I am being difficult and just not willing to pay; exp[ld] to the atty that was not the case; expld I am trying to protect my insured; atty said he is willing to have his client sign a Release; again expld to the atty what is needed for me to conclude the BI claim if/when the policy limits are tendered; asked if he had the UIM rep's name; said he did not and did not want me to contact them; he is not sure if his client will go thru his UIM carrier and if I did not settle the case today, my insured would be sorry. . . ." Ex. C to defendant's motion.

Jason Taylor, Pulliam's team manager, reviewed the documenting of Pulliam's September 30th conversation with Berry as well as her handwritten notes. He stated that "[i]t sounds like the attorney is wanting to [expedite] settlement as fast as he can to dodge liens. Surely he knows if he settles the BI claim of his client without the UM carrier voluntarily waiving [its] right of sub, they could deny coverage (UM) for him destroying their right of sub. There's something a bit suspicious about this. I am okay

with you extending ABI authority of $25k, so long as we get a UIM sub waiver and follow our normal procedures." Ex. C to defendant's motion.

In a letter dated September 30, 2005 to Pulliam, Berry enclosed a copy of a petition he was planning to file naming Wirtz as a defendant and seeking actual and punitive damages as a result of Wirtz's negligence. According to Berry, "[t]he reason I am filing this Petition is that you have taken an unreasonable position in this case by refusing to pay $25,000.00 policy limits to Mr. Thompson in exchange for a full release of all claims. Your position is wrong. You are quite adamant about it and I have been unsuccessful in persuading you to abandon this position . . . You don't need a waiver from Farmers in order to get a release and protect your insured. It is unfortunate that State Farm has taken this position and caused this case to go into litigation against Mr. Wirtz." Ex. 9 to plaintiffs' motion.

On September 30, 2005, Pulliam attempted to contact Farmers regarding the uninsured motorist coverage. Pulliam was advised that Thompson did not carry uninsured motorist coverage. Pulliam thereafter received a call from Judy Pettigrew, a Farmers' representative who informed Pulliam that uninsured motorist insurance did exist and that Farmers would run an asset check on Wirtz and then advise whether or not they would waive subrogation.

On October 3, 2005, Pulliam faxed a letter to Berry stating that she had received Thompson's medical information and offered $25,000.00 to conclude Thompson's claim. Pulliam stated "[t]his offer is contingent upon a subrogation waiver from all the UIM carriers." Ex. 10 to plaintiffs' motion.

On that same day, Pulliam received the September 30th letter from Berry. Pulliam contacted Berry. Pulliam described the letter as alleging "that I am refusing to pay our policy limits; Called atty Berry and advised that that is incorrect and advised what is needed for me to conclude the BI claim when policy limits have been

extended." She also advised Berry that she had been in contact with Farmers and that Farmers was working on a letter advising whether or not Farmers would waive their rights of subrogation. Berry said "Porter v. MFA states that we do not need any info from the uim carrier and now will follow thru with his suit seeking punitive damages." Ex. C to defendant's motion.

Pulliam also sent a letter to Berry on October 3, 2005 acknowledging receipt of the September 30th letter. In the letter, Pulliam stated:

> You and I both know that I never refused to pay the policy limits of $25,000.00. We have had several conversations both agreeing that Mr. Thompson's claim values in excess of Ms. Callahan's limits. Your frustration came in our telephone conversation of September 30, 2005, when you wanted me to ignore your own client's UIM carrier's subrogation rights and settle Mr. Thompson's claim right away before any liens were filed against him. When I advised what was needed to conclude Mr. Thompson's claim, you threatened to file suit if I did not settle on 9/30/05.
>
> Again, I am offering the policy limits of $25,000.00 to settle Mr. Thompson's injury claim. This offer is contingent upon a subrogation waiver from the UIM carrier, Farmers Insurance Company.

Ex. 12 to plaintiffs' motion.

In a letter dated October 3, 2005, Berry advised that he was going to go ahead and proceed with full litigation. According to Berry, "[y]ou indicated to me that you had not looked into Porter v. MFA as I suggested you do last week but that you had talked to in house counsel and been assured that you were handling the claim properly . . . I just don't think this uninsured motorist issue is justification for you not paying us the $25,000.00 in exchange for full and complete general release from the Thompsons'." Ex. 11 to plaintiffs' motion.

Berry sent another letter to Pulliam on October 3, 2005 enclosing a file-stamped copy of the petition he had filed and advising that he was going to serve it upon Wirtz. At the end of the letter, Berry handwrote "P.S. We just had another phone call and you again refused to pay $25,000 even though Judy Pettigrew [Farmers' representative] has told you they'll waive subrogation.  Why not just pay??"  Ex. 13 to plaintiffs' motion.

On October 5, 2005, Wirtz was served with the petition and State Farm obtained independent counsel to represent Wirtz.

On October 7, 2005, Wirtz's counsel sent a letter to Berry advising that State Farm had received a written waiver of subrogation and was able to pay Wirtz's liability policy limits.  Wirtz's counsel enclosed a settlement draft, release and dismissal with prejudice of the litigation against Wirtz.

On October 10, 2005, Berry sent a letter to Wirtz's counsel returning the check for $25,000.00, advising that "we are no longer willing to settle this matter."  Ex. 15 to plaintiffs' motion.  At that time, there were "no liens on the settlement draft."  Ex. O to defendant's motion.

Pulliam sent a letter to Callahan dated November 1, 2005 stating:

> As you are aware, we have tried early on to settle Mr. Thompson's claim for the available policy limits.  We advised Mr. Thompson's attorney that a subrogation waiver was needed from his client's underinsured motorist carrier, Farmers, protecting you and Charles from being sought after by his insurance company.  Mr. Thompson's attorney disagreed that the above information was needed and alleged I was refusing to settle Mr. Thompson's case, thus resulting in filing this lawsuit.
>
> I want you to know I never refused to settle this case.  In fact, I made it clear we were ready to settle the claim for your full policy limits.  However, we needed a waiver of

> rights from Mr. Thompson's insurance company.  To settle
> without it, could have left you exposed to litigation from
> Mr. Thompson's insurance company to recover payments
> they made to their insured.

Ex. P to defendant's motion.

In the state court action against Wirtz, the jury returned a verdict in favor of Thompson for actual damages in the sum of $285,000.  No punitive damages were awarded.  A journal entry of judgment was entered on November 3, 2006 against Wirtz for $285,000, plus costs and interest.

State Farm tendered the $25,000.00 policy limits to Thompson.  On November 27, 2006, Berry filed a partial release and satisfaction of judgment.

An information was filed against Wirtz charging the offense of hit and run. After Wirtz pleaded guilty to the charge, he was ordered to pay restitution in the amount of $260,000.00.

Wirtz and Callahan brought this action against State Farm on September 16, 2008.


Discussion

Callahan's Claims

In its motion, State Farm seeks summary judgment on the claims asserted by Callahan.  Since the completion of the briefing on the motion, the parties have filed a joint stipulation of dismissal without prejudice as to Callahan.  Callahan's claims against State Farm have accordingly been dismissed.  The court therefore concludes that State Farm's motion should be denied as moot as to Callahan's claims.  The court also treats the motion for summary judgment previously filed by Wirtz and Callahan as filed only by Wirtz.

Breach of Contract Claim

In his motion for summary judgment, Wirtz seeks summary judgment on his breach of contract claim. Wirtz contends that by insisting upon a waiver of subrogation, State Farm breached the insurance contract. State Farm, in response, asserts that Wirtz's claim is a surprise in that no such claim was alleged in the petition originally filed in state court. State Farm asserts that the petition only alleged a cause of action for a breach of the duty of good faith and fair dealing and a cause of action for punitive damages. In addition, State Farm contends that no breach of contract has occurred in that it defended Wirtz in the state court litigation brought by Thompson and ultimately paid the $25,000.00 policy limits to Thompson after the jury returned its verdict. State Farm asserts that its contractual obligations to defend and indemnify were fulfilled. In reply, Wirtz contends that he gave notice of the breach of contract claim in the joint status report.

The court need not decide whether Wirtz adequately placed State Farm on notice that he was pursuing a breach of contract claim. The court concludes that plaintiff is not entitled to summary judgment on such claim. Wirtz has failed to present any authority that he may pursue a breach of contract action based upon State Farm's alleged failure to settle Thompson's claim within the $25,000.00 limits of the insurance policy. The cases cited and relied upon by plaintiff involve bad faith claims. As plaintiff has not presented any authority that he may pursue a breach of contract claim based upon a failure to settle a third-party claim, the court finds that Wirtz is not entitled to summary judgment on the breach of contract claim.

Bad Faith Claim

State Farm contends that it is entitled to summary judgment on Wirtz's bad faith claim on the basis that State Farm's actions cannot be reasonably perceived as tortious. State Farm asserts that its actions were reasonable under the circumstances,

and that it was motivated by a sincere desire to protect its insured from future liability. State Farm maintains that, under the totality of the circumstances, the third-party claim was, as a matter of law, handled reasonably. In addition, State Farm argues that Wirtz's claim must fail because Wirtz cannot established that he was damaged by State Farm's conduct. State Farm contends that due to the restitution ordered in the criminal case, Wirtz is subject to the same debt and suffers the same damages regardless of State Farm's actions.

Wirtz, on the other hand, urges that he is entitled to summary judgment on the basis that State Farm's insistence on subrogation waiver, in addition to a full release, to settle Thompson's third-party claim was unreasonable in light of applicable Oklahoma law, specifically, Porter v. MFA Mut. Ins. Co., 643 P.2d 302 (Okla. 1982). Wirtz additionally argues that in regard to damages, the restitution order does not require the payment of accruing interest. Plaintiff argues that even if he pays his entire restitution to Thompson, he would still owe interest on the underlying civil judgment. Furthermore, Wirtz contends that he cannot acquire any assets and cannot financially prosper because any assets he obtains are subject to levy for the civil judgment.

The essential elements Wirtz is  required to establish to make out a prima facie case of bad faith are: (1) Wirtz was covered under the automobile liability insurance policy issued by State Farm and that State Farm was required to take reasonable actions in handling Thompson's claim; (2) the action of State Farm was unreasonable under the circumstances; (3) State Farm failed to deal fairly and act in good faith toward him in the handling of Thompson's claim; and (4) the breach or violation of the duty of good faith and fair dealing was the direct cause of any damages sustained by Wirtz. Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1093 (Okla. 2005). The essence of an action for breach of the duty of good faith and fair dealing "is the

insurer's unreasonable, bad-faith conduct." *Id.* at 1094.   If there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of the insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact. *Id.*

Although the parties have filed cross-motions for summary judgment as to the bad faith claim, the court concludes that neither party is entitled to judgment as a matter of law on that claim.   The court concludes, upon careful review of all the evidence in the record, including the affidavits of Harvey Lewis and Edwin Ash,[1] that there is conflicting evidence from which differing inferences may be drawn regarding the reasonableness of State Farm's conduct in this action.   Viewing the facts in the record in the light most favorable to Wirtz, the court also concludes that State Farm's conduct may be reasonably perceived as tortious.   Willis v. Midland Risk Ins. Co., 42 F.3d 607, 612 (10th Cir. 1994).   In reaching its decision, the court is mindful that State Farm is assumed to know the applicable Oklahoma law, and that the reasonableness of its decisions must be judged in light of the law.[2] *Id.*   The court also finds that Wirtz has sufficiently demonstrated that he suffered damages directly caused by State Farm's conduct.   Therefore, at this juncture, the legal gate to submission of the bad faith claim to the jury is opened. *Id.*

---

[1] *See*, Ex. 20 to Wirtz and Callahan's motion; Ex. V to State Farm's motion.

[2] As stated by the Oklahoma Supreme Court in Porter v. MFA Mut. Ins. Co., 643 P.2d 302, 305 (Okla. 1982):

> It seems to be a well-recognized rule that if an insured settles with and releases a wrongdoer from liability for a loss before payment of the loss has been made by the insurer, the insurer's right of subrogation against the wrongdoer is thereby destroyed . . . [The insured], by voluntarily and knowingly making settlement with and giving a general release to [the tortfeasor], barred [the insurer] from exercising its lawful right of recourse against the responsible party. . . . .

Statute of Limitations

State Farm also seeks summary judgment on the bad faith claim on the basis that Wirtz's bad faith claim is barred by the applicable two-year statute of limitations.[3] It contends that the actions upon which the bad faith claim is based all occurred in September and October of 2005. It also asserts that by November 1, 2005, Wirtz and Callahan were aware that Wirtz had been sued by Thompson, that State Farm had tendered the policy limits to Thompson's lawyer who had refused to settle and that Thompson was certain to get a verdict far in excess of the $25,000.00 policy limits. This action, however, was not brought until September of 2008. State Farm argues that the case is time-barred because the undisputed facts confirm that the conduct upon which this action is based occurred more than two years prior to the filing of the action.

Wirtz contends that the action is timely because he was not injured until the judgment in favor of Thompson was entered. The lawsuit, he argues, was clearly filed within two years of the judgment.

The court agrees with Wirtz that the action is timely. The court concludes that the action did not accrue before the judgment was entered and became final. At that point, excess liability was established. Only at that point did Wirtz have a right to proceed against State Farm for exposing him to excess liability to Thompson. Only at that point could he bring a bad faith claim to a successful conclusion. Stephens v. General Motors Corp., 905 P.2d 797, 799 (Okla. 1995) (Cause of action accrues when a litigant could first maintain an action to a successful conclusion); *see also*, Torrez v. State Farm Mut. Auto Ins. Co., 705 F.2d 1192, 1202 (10th Cir. 1982) (applying New

---

[3] Extant jurisprudence imposes a two-year limitation upon a tort action based on bad-faith refusal to settle a claim. Taylor v. State Farm Fire and Cas. Co., 981 P.2d 1253, 1257 n. 10 (Okla. 1999).

Mexico law) (cause of action for bad faith in failing to settle a claim within policy limits did not accrue until judgment was final).  The court therefore concludes that defendant is not entitled to summary judgment on the basis of the statute of limitations.

Punitive Damages

Finally, State Farm seeks summary judgment on plaintiff's request for punitive damages.  State Farm contends that as a matter of law, it cannot be said to have acted intentionally and with malice and in reckless disregard for the rights of the public in general and plaintiff in particular.   The court declines to grant summary judgment on the issue of punitive damages.  The court concludes that any ruling on the issue of punitive damages should be made after the court has had an opportunity to hear all the evidence offered in support of plaintiff's claim.  State Farm may revisit the issue at the Fed. R. Civ. P. 50 stage of the proceedings, if appropriate.

Conclusion

Based upon the foregoing, Defendant State Farm Mutual Automobile Insurance Company's Motion for Summary Judgment, filed May 1, 2009 (doc. no. 29), is **DENIED**.  Plaintiff's Motion for Summary Judgment, filed May 4, 2009 (doc. no. 31), is also **DENIED**.

DATED July 13, 2009.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

08-1062p005(pub).wpd

14